F7g4AvaS

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4            v.                          13 CR 811

5   MARTIN AVALO,

6              Defendant.

7   ------------------------------x

                                        New York, N.Y.
8                                       July 16, 2015
9                                       2:40 p.m.

10
    Before:
11
                    HON. ANDREW L. CARTER, JR.,
12
                                        District Judge
13

14                      APPEARANCES

15
    PREET BHARARA
16       United States Attorney for the
         Southern District of New York
17  RUSSELL CAPONE
         Assistant United States Attorney
18
    DAVID GREENFIELD
19  BENNETT M. FEITELL
         Attorneys for Defendant
20

21

22

23

24

25

F7g4AvaS

1        (In open court)

2        (Case called)

3        THE DEPUTY CLERK:   Counsel, please state your

4  appearance.   For the government?

5        MR. CAPONE:   Russell Capone for the government.   Good

6  afternoon, your Honor.

7        THE DEPUTY CLERK:   And for the defendant?

8        MR. GREENFIELD:   Good afternoon, your Honor.   David

9  Greenfield and Bennett Feitell for the defendant, Martin Avalo.

10       THE COURT:   Good afternoon.

11       Good afternoon, Mr. Avalo.

12       Are the parties prepared for sentencing today?

13       MR. GREENFIELD:   We are, your Honor.

14       MR. CAPONE:   Yes, your Honor.

15       THE COURT:   All right.   To the extent that I did not

16  already do so, I accept the plea of guilty that was offered on

17  November 10, 2014.

18       In preparation for today's sentence, I have reviewed

19  the presentence report, a letter submitted by Mr. Avalo, a

20  sentencing submission from defense counsel, as well as a

21  submission from the government.

22       Is there anything else that I should have?

23       MR. GREENFIELD:   Not that I'm aware of.

24       MR. CAPONE:   No, your Honor.

25       THE COURT:   Defense counsel, have you read the

F7g4AvaS

1    presentence report and discussed it with your client?

2              MR. GREENFIELD:  Numerous occasions, Judge.

3              THE COURT:  Mr. Avalo, have you read the presentence

4    report and discussed it with your attorney?

5              THE DEFENDANT:  Yes, sir.

6              THE COURT:  Have you had the opportunity to go over

7    with him any errors in the report or anything else that should

8    be taken up with me?

9              THE DEFENDANT:  Yes, sir.

10             THE COURT:  Counsel for the government, have you

11   reviewed the presentence report?

12             MR. CAPONE:  I have, your Honor.

13             THE COURT:  Okay.  Are there any objections to the

14   report regarding factual accuracy?

15             MR. CAPONE:  No, your Honor.

16             MR. GREENFIELD:  No, your Honor, but I do have

17   something to say about the guideline calculation.

18             THE COURT:  Before you get to that, is there any

19   objection to the guidelines calculation in the presentence

20   report?

21             MR. GREENFIELD:  No, your Honor.

22             MR. CAPONE:  No, your Honor.

23             THE COURT:  Is there objection to anything else in the

24   presentence report?

25             MR. CAPONE:  No, your Honor.

F7g4AvaS

1          MR. GREENFIELD:  No, your Honor.

2          THE COURT:  Although I'm no longer required to

3     following the sentencing guidelines, I'm still required to

4     consider the applicable guidelines in opposing sentence, and to

5     do so, it is necessary that we accurately calculate the

6     guideline sentencing range.

7          I have done my own independent evaluation of the

8     guidelines, as well, and I agree with the guideline calculation

9     that's set forth in the presentence report.  So based on my own

10    independent calculation, as well as the lack of any objection

11    by either party, I will adopt the guideline range as set forth

12    in the presentence report, total offense level of 23 with

13    criminal history category V, resulting in a guideline range of

14    84 to 105 months.

15         MR. GREENFIELD:  Your Honor, if I might --

16         THE COURT:  Before you do that, let me also deal with

17    one other matter.  Let me make sure, Mr. Avalo, are you

18    prepared to go forward with sentencing today?

19         THE DEFENDANT:  Yes, sir.

20         THE COURT:  In the last 24 hours, have you had any

21    alcoholic beverages, drugs, or medication of any kind?

22         THE DEFENDANT:  No, sir.

23         THE COURT:  Is your mind clear as you sit here today?

24         THE DEFENDANT:  Yes, sir.

25         THE COURT:  Go ahead, counsel.

F7g4AvaS

1              MR. GREENFIELD:  Judge, with respect to the

2      government's submission to the Court about the finding of

3      category V, in it, on the bottom of page 1, it says, "Avalo

4      does not dispute the fact that he falls within category V, and

5      the plea agreement does not limit the government to argue for a

6      sentence within the guidelines."  That is all true.

7              Between myself and Mr. Masimore we reached an

8      agreement that the sentencing guideline criminal history

9      category should be IX, not the number XI that they're talking

10     about now.  And in order to try to deal with the difference

11     between what was in the plea agreement at IX and what the

12     pretrial report says should be XI, I initiated a series of

13     phone calls between myself and Mr. Masimore, going back to

14     January of this year, and I brought it to his attention that I

15     thought the guidelines overstated the seriousness of his

16     criminal history.

17             He said, look, I haven't had a chance to look at it

18     yet.  Obviously, these are not quotes, but they're the

19     substance of the conversation.  I said, all right, get a chance

20     to look at it and get back to me.  And I initiated three, four,

21     maybe five more phone calls, and always the same thing.

22             I haven't had a chance to look at it yet.  He also

23     said that it is the policy of the office usually to stand by

24     their agreement.  So he couldn't see, based on what I said

25     about these two misdemeanors that occurred in 2013, which ended

F7g4AvaS

1    in violation pleas should kick his criminal history category

2    from 70 to 84, on the minimum side.   That's a 14-year kick for

3    two pleas to a misdemeanor within a month sometime in 2013.

4            I was becoming alarmed by this, Judge.   I hadn't heard

5    from Mr. Masimore.   Finally, the end of June, I called his

6    office, got a voice mail message that he was in Italy; if

7    something was important enough, please call.

8            I called him.   The same conversation occurred.   He

9    would get back to me.   He never did.   There's never been a

10   resolution.

11           I made the mistake -- that he shouldn't be punished

12   for -- I made the mistake to believe that collegiality still

13   existed and that when somebody tells me that there is basically

14   a policy that they will live by their plea agreement, I figured

15   I could file my sentencing memo without referring to that, and

16   I hoped that it would be resolved before we came before your

17   Honor.   But it hasn't been.   And I think that the finding of 84

18   to the high end is totally unfair to my client based on his

19   criminal record.   If I can, I will go over it with you.

20           THE COURT:   Wait.   Before you do that, let me just

21   state some things for the record.   I am not supposed to get

22   into any sort of plea negotiations between the government and

23   the defense.   Any other negotiations the government and the

24   defense want to have in terms of positions they want to take at

25   sentencing, again, is something that is up to them.

1        Even to the extent that the defense and the government

2   were to agree as to what the appropriate guideline range would

3   be, that would not be binding on me nor it would be binding on

4   the probation department, as was made clear at the time

5   Mr. Avalo pled guilty.  There was no promise at that time as to

6   what his guideline range would be, nor is there a promise as to

7   what his sentence would be.  Those factors would be things that

8   I would consider.

9        I understand, I suppose, defense counsel's frustration

10  regarding any potential miscommunications and breakdown in

11  negotiations between defense counsel and the government, but in

12  terms of the guidelines, which are advisory, they're not

13  binding on the Court anymore, I have the discretion to, once I

14  have determined the guideline range, as I have, to sentence

15  Mr. Avalo within or outside of that guideline range, and I can

16  do so either based on what was commonly called in the past

17  downward departures or a sentencing variance, as sometimes it

18  is called.  In any event, considering all of the factors in

19  18 U.S.C. 3553, which is what I need to be concerned with now,

20  that we have established the guideline range that applies, the

21  nonbinding guidelines range that applies.

22       I understand defense counsel's position to be that it

23  would be unfair to sentence him as if he were within sentencing

24  criminal history category V.  I understand that.  I take that

25  argument to be, as expressed in the letter, an argument for a

F7g4AvaS

1    sentencing variance as opposed to a downward departure.  I

2    believe the parties may have an agreement amongst themselves.

3    I don't know if they do or do not.  It's typically the case

4    that parties have agreements not to seek downward departures.

5    That certainly doesn't prevent the Court from sua sponte

6    considering downward departures.

7            I have seen what defense counsel has submitted

8    regarding the criminal history category in this case, and I

9    have also done my own evaluation of his criminal history

10   category, and I need to, under Second Circuit authority, give

11   the parties notice that I am considering a downward departure

12   based on the criminal history category substantially

13   overstating the seriousness of his criminal record.  Obviously,

14   those are factors that I consider as a sentencing variance, as

15   well, outside of the earlier sentencing departure regime.  But

16   for a departure, if it is not something that was laid out in

17   the parties' submissions -- and again, looking at the

18   submissions, it did not appear to be laid out as a request for

19   a downward departure -- I need to give the parties notice that

20   I'm considering that.  It doesn't mean I'm going to do that.

21   But I need to give the parties notice of that under Second

22   Circuit authority so the parties can discuss whether or not

23   they wish to proceed or whether or not they wish to have some

24   time to think about this before we continue.

25           I guess initially let me ask the government, do you

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

F7g4AvaS

```
1    need more time to proceed or do you need more time to think
2    about whether you need more time to proceed?  If you would
3    like, I can take a five-minute recess, and you can let me know
4    if you need more time before we continue, and I will ask the
5    same question of defense counsel.
6              MR. CAPONE:  I don't think we need more time, your
7    Honor.
8              THE COURT:  Defense counsel?
9              MR. GREENFIELD:  Is it you are considering a downward
10   departure at this time?
11             THE COURT:  Yes, but I didn't way I was going to do
12   it, but --
13             MR. GREENFIELD:  We are ready to proceed, your Honor.
14             THE COURT:  Now that I have raised that sua sponte and
15   given the parties notice that I am considering that, let me
16   hear -- let me just share what my thoughts are regarding this.
17   Mr. Avalo is in criminal history category V.  My considering a
18   downward departure is not contingent on or predicated on
19   whatever analysis the parties may have had in terms of the plea
20   agreement, because as I have said before, anything in that plea
21   agreement regarding the parties' guideline estimate is not
22   binding on the probation department or the Court.  Again, we
23   can move beyond I believe any of these arguments about
24   negotiations between the parties and all of these other things.
25             Let me just hear from the parties on the proprietary
```

F7g4AvaS

1    of a downward departure, starting with counsel for the defense.

2              MR. GREENFIELD:  Judge, if I might, the criminal

3    history of my client begins in 1997.  As an 18-year-old, he was

4    arrest for the sale of marijuana.  He was sentenced to

5    probation and then sentenced to jail because he was in

6    violation of his probation.  He received three points for that

7    on that plea in 1997, 1998.

8              Next, he is arrested November 28th of 2001 for a

9    street sale of $20 worth of cocaine.  For that, he received

10    three more points and five years in jail, basically.

11              From that point on, at the age of 22, in jail for

12    maybe five years or so, maybe more, maybe up to six, he was

13    never arrested again until 2013, and he was arrested over a

14    period of three separate days in May and June of 2013, each for

15    misdemeanor weight marijuana, which were disposed of by

16    violation pleas in criminal court where he received a

17    conditional discharge and a $50 fine.

18              The government makes him a hardened criminal based on

19    his criminal record at this point.  I'm saying, based not only

20    on his life, the problems that he's faced in his life, his

21    addiction, his abuse as a child for sexual abuse, that the fact

22    that the probation department moved him over and the Court has

23    agreed to move it over to category V, that it makes it a

24    14-month jump absent those misdemeanor -- or not even

25    misdemeanor arrests -- conditional discharge pleas in 2013.  If

F7g4AvaS

1   they weren't there, he'd be clearly in category IX.  What puts

2   him in category XI are three misdemeanor pleas.

3          THE COURT:  Just to be clear, when you are talking

4   about category IX and XI, I assume what you're talking about --

5          MR. GREENFIELD:  Criminal history category --

6          THE COURT:  -- 11 points, which would have him

7   criminal history category V and 9 points that would have him

8   criminal history category IV?

9          MR. GREENFIELD:  Correct.

10          It overstates the seriousness of his criminal conduct.

11   The two major matters occurred before he was 22 years old, in

12   1997 and 2001.  After that he had a good work record.  When he

13   got out of jail, he had a good work record.  You have tax

14   returns for the years 2010 '11, and '12, and it is indicated in

15   paragraph 150 of the probation report.  He had work release

16   while in prison, and he worked two years while in prison.  The

17   only reason he was not working after that is he lost his job

18   because of a layoff in a non-union situation.

19          THE COURT:  Tell me specifically which convictions it

20   is that you believe substantially overstate the seriousness of

21   his criminal record?

22          MR. GREENFIELD:  There were two.  There were three

23   arrests but two.  In May and June of 2013 for marijuana.

24          THE COURT:  And why is it that you feel those

25   overstate the seriousness, substantially overstate the

SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

F7g4AvaS

1    seriousness of his criminal record or the likelihood that he

2    would re-offend because, obviously, under the case law I am

3    also supposed to consider that, as well, the likelihood that he

4    would re-offend.

5            MR. GREENFIELD:  There is no issue but that he is a

6    drug abuser.  His drug abuse started at 11, when he was

7    misusing, if I can use that phrase, prescription drugs.  He

8    started using marijuana at the age 12.  He became addicted, if

9    that's the right word, to marijuana soon thereafter.  He smoked

10   marijuana basically after the day of his arrest, and he abused

11   legal substances such as Codeine, Oxycontin, and other legal

12   substances.

13           The arrests were because of his addiction.  He was out

14   there trying to earn a few dollars for himself so he could buy

15   some drugs.  That's what he was out there for, Judge.  He

16   wasn't out there as a burglar.  He wasn't out there as a seller

17   of large amounts of drugs.  He was selling small amounts,

18   misdemeanor amounts on the street, and that's what he was

19   arrested for.  Adding 14 months to his prospective minimum

20   sentence I don't think is appropriate.

21           THE COURT:  So the record is clear, the guidelines are

22   advisory.  The guidelines are advisory, they're not mandatory.

23           MR. GREENFIELD:  I understand that, Judge.

24           THE COURT:  What I'm concerned about in terms of those

25   last two convictions that you're referencing, it very well may

F7g4AvaS

1    be that his criminal history category V substantially

2    overstates the seriousness of his criminal record or that he

3    may re-offend.  I don't know about those last two doing that.

4    Those last two, to me, don't seem to indicate a likelihood that

5    he was not going to re-offend when he is 33 years old, caught

6    in May of 2013, with ten bags of marijuana in the left pocket

7    of his cargo pants at 1:30 in the afternoon.  I don't think

8    that it has anything to do in terms of -- it shows a likelihood

9    that he wouldn't re-offend or that it would be unfair to count

10   a conviction in June, late June of 2013, when he was 34 years

11   old.  Although he was convicted for possession of marijuana, in

12   paragraph 115, it indicates that, at 1:40 a.m., in the morning,

13   he was stopped while operating a vehicle with excessive window

14   tints.  So he was very fortunate that he was simply arrested

15   for possession of marijuana, because according to the facts of

16   that, it seems that he was perhaps driving under the influence

17   of an intoxicant or an inebriant in any situation.  Again, he

18   is 33 and 34 at the time those took place.  Those, to me, are

19   not the convictions I was thinking about that might be

20   substantially overstating the seriousness of his criminal

21   record.  I was more concerned with his earliest conviction, and

22   while that is certainly a serious offense, in which he was

23   found in possession of 10 pounds of marijuana, that took place

24   when he was 18 years old, following not too far after a

25   youthful offender adjudication that he had for also selling

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

F7g4AvaS

drugs, selling crack cocaine, but there is a difference there

in terms of the crimes committed.  It was more perhaps

unfortunately understandable that at the age of 17 he didn't

learn his lesson when the court was very lenient with him and

gave him youthful offender treatment in terms of the

convictions.  The other convictions, when he is in his thirties

and he is selling marijuana and driving around under the

influence of marijuana, those seem like more serious concerns

to me.

Is there anything you want to add to what you have

said?

MR. GREENFIELD:  No, your Honor.

THE COURT:  Let me hear from counsel for the

government.

MR. CAPONE:  Your Honor, I don't agree that the

conviction at the age of 18 is one that should lead the Court

to depart.  I understand he was 18 years old, but it is the

most serious of his offenses short of this one.  It's 10 pounds

of marijuana.  That is not a street-level sale.  That is

trafficking in a significant quantity of drugs, more so than

some of these other convictions.  And this is also an offense

that he then violated probation for.  That's why he has more

points, actually.  It looks like he didn't get a significant

jail sentence for it.  It would have only been one point in

spite of the fact it was -- sorry, that's the first one that he

F7g4AvaS

violated his probation on.  In any event, it is a significant

quantity of marijuana.

             In terms of the likelihood of re-offense, there is a

long history of criminal activity from the age of 17 to the

present, to the year 2013, that I think should give the Court

significant concern.  There is a conviction in '96.  There is a

serious conviction in '97.  There is a conviction in 2001.

There is a gap until 2013 that Mr. Greenfield refers to, but

from 2001 until 2010, he was either in inpatient treatment or

in jail for a good part of that.  That explains why he is not

continuing to commit crimes.  From 2010 to 2012, when

Mr. Greenfield stresses his employment and doing good things

during that time period, the current offenses are smack in the

middle of that time period.  And again, more crimes in 2013.

He has two parole violations, including for the current

offense, he was committing this crime while on parole.  While

concededly these are not violent crimes except for the

marijuana actually, these are not huge quantities of narcotics,

there is a long pattern of criminal activity and of not being

deterred despite being sentenced, spending time in jail, not

being deterred while on parole.

             While I don't dispute that your Honor can take all of

this into account in terms of 3553(a), I don't think we are in

a departure circumstance here.

             THE COURT:  Okay.  Thank you.

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

F7g4AvaS

        Let me find out if the parties have any information

regarding the bench warrant that was issued back on

September 15, 1998, when he was on probation for that criminal

possession of marijuana in the first in Queens for the

10 pounds of marijuana.  I notice that it doesn't appear that

he was arrested on a warrant because he picked up another case

so to speak.  It may be, based on what is in the presentence

report and the information about his addiction that perhaps

there was a bench warrant issued because he tested positive for

drugs, but I don't know if the parties have any information

about that.

        MR. CAPONE:  I don't, your Honor.  You may be right

because he, obviously, had already pleaded and been sentenced

at that point.  So it is unlikely a failure-to-appear type of

bench warrant.

        MR. GREENFIELD:  He tested positive for the drug test

when he went to see the probation people, and then he didn't go

back to court.

        THE COURT:  It does seem to me -- and I want to hear

if the government has anything to add again -- that earliest

conviction -- and even though I understand it follows a

youthful offender adjudication -- it seems from the presentence

report that when he was arrested on December 4, 1996, at the

age of 17, and got that youthful offender adjudication, that he

was sentenced on March 24, 1997 to a year.  My belief is

F7g4AvaS

1    certainly at that time -- I think it is still the case -- in

2    New York State if you're sentenced to a year in custody, you do

3    what is known as the city time and do two-thirds of that time

4    in jail, which means he would have done eight months in

5    custody, would have been released sometime in August of 1997,

6    and then perhaps -- and obviously, if he did that, did that

7    eight months in custody, was not going to be receiving any sort

8    of drug treatment at that time or getting any sort of help with

9    the addiction, and then shortly after that, he has this other

10   again serious offense but it seems as if he is doing so

11   definitely in the midst of his addiction to marijuana at that

12   time.

13           Now, again, I'm more concerned with the offenses that

14   took place after that because it does seem that at that point

15   after that conviction he is certainly given probation and I'm

16   assuming given the opportunity for drug treatment, and it seems

17   from this perhaps relapse -- again, I don't have all those

18   facts in front of me -- certainly would have been given the

19   opportunity for drug treatment, it didn't work.  Sometimes that

20   happens.  It usually doesn't work necessarily the first time.

21   I'm not trying to minimize the significance of the 10 pounds of

22   marijuana, but it does seem to me at that time, at the age of

23   17, doing eight months in jail, getting out without having any

24   treatment and then still dealing with this addiction, and based

25   on the trauma that he experienced as a child, it is certainly

F7g4AvaS

1    not something that the Court would condone, but the Court

2    understands and it does seem that that is something that

3    substantially overstates the seriousness of his criminal

4    record, those three points for that.

5          Again, the subsequent convictions I don't have those

6    same concerns because then he had an opportunity to receive

7    some drug treatment and had an opportunity to have been

8    convicted of a felony instead of just a youthful offender

9    adjudication and didn't seemingly learn his lesson when he was

10   22 years old.  I'm certainly not convinced that these other

11   convictions when he was in his thirties represent an indication

12   that there was not a likelihood of re-offending.  So I am

13   inclined to horizontally depart under 4A1.3 for those three

14   points for the crime listed in paragraph 104, which would take

15   him from 11 criminal history points to 8 criminal history

16   points, which would take him to criminal history category IV,

17   but let me hear from the government if there is anything else

18   you want to say.

19         MR. CAPONE:  Well, your Honor, I understand your

20   ruling.  I don't necessarily agree that whether he was addicted

21   to drugs at the time or at the time of any of the offenses, I

22   don't know that that goes to the seriousness of his record.  It

23   is part of the picture of who he is, but I don't know that it

24   undermines the seriousness of the record.  So I will just note

25   my objection for that purpose.

F7g4AvaS

1          THE COURT:  Anything else from the defense on this?

2          MR. GREENFIELD:  No, your Honor.

3          THE COURT:  I will horizontally depart one criminal

4    history category to criminal history category IV, for a total

5    criminal history point value of 8.

6          Let me hear from the parties regarding any other

7    issues they wish to raise, starting with defense counsel.

8          MR. GREENFIELD:  I will try to keep it as brief as

9    possible.  Yes, your Honor.

10         Without going over his criminal record again and his

11   work history during that period of time, I'm going to just now

12   address his role quickly in the offense and also go into what I

13   believe are significant 3553(a) factors that should be

14   considered for variance purposes.

15         Quickly, I don't even know the number of burglaries

16   that were involved in this, but I know it was a great number.

17   My client was involved in six of them.  He was not a planner,

18   organizer, manager.  He didn't set any of them up.  He didn't

19   dispose of the pharmaceuticals that were taken.  In fact, he

20   used them whenever he got his hands on them.  Basically, he is

21   that, somebody who got involved in criminal conduct, but

22   certainly not a master mind of this ring.

23         To a degree, obviously, people are sentenced because

24   of the crimes they commit and to a degree they should be

25   punished for that.  Actually, I was watching TV two days ago

F7g4AvaS

1    and I heard the president discuss before the national

2    convention of the NAACP what he believed were some of the

3    problems with the criminal justice system, and he talked about

4    over sentencing.  He talked about the lack of vocational

5    training.  He talked about the lack of drug rehabilitation, and

6    he talked about education.  But more surprisingly yesterday,

7    when I was preparing for this at home, I had the TV on, and up

8    popped former President Clinton, and he talked about what he

9    believed was the failure of the Criminal Activity Act of 1994.

10   He considered it an absolute failure, his words.  He thought

11   that the excessive sentencings were wrong, his word.

12           Now, why did he do that?  And he explained it.  He

13   said the reason I say it is wrong, the reason I say the whole

14   criminal justice system needs retooling -- my word, not his --

15   is we, in 1994, meaning the Democrats, were in a situation

16   where we politically were getting our butts kicked year and

17   year after because we were quote/unquote soft on crime.  That

18   is why that act was enabled in Congress.  Those were his words

19   again.  He said we were wrong, we shouldn't have done it, and

20   we have to do something about it, and we have to do it now.  He

21   was talking about sentencing and the excessive sentences that

22   are -- I wouldn't say mandated -- they are obviously not

23   mandated anymore -- but that are being given out and have been

24   given out in the past.

25           Let's talk about my client now.  You read in the

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

F7g4AvaS

probation report about, growing up as a little child, he was

the victim of repeated sexual abuse by neighbors.  His father

was at work around the country.  His mother was at work.  She

left him with the neighbors for care, and he was abused.  He

brought it ultimately -- I don't know when and where, and it is

hard to talk with him about that because it is a hard subject

to talk about -- but he obviously at one point told his father

what happened.  And rather than react favorably, his father

didn't believe him and beat him.  So that is a kid who is

between four and eight years old, that's happening to him.

It's got to affect him somehow.  Does it make him a criminal

back then?  No, obviously, that is not what happens.  But God

only knows at this point where his head was at because he was

rejected by his family, if he was telling the truth, rejected

by his family when he was being abused.  That is a hard thing

for a child under eight, seven, six, five, or four to

comprehend.

At the age of 11, he was involved in a bike accident.

He was hospitalized for a long period of time.  He became

medicated, overmedicated, and he became a drug abuser at that

point.  Between the beginning of his use of marijuana and the

medications, he became a drug abuser.

He went to Daytop Village for two years, as the Court

is aware, but he was diagnosed there as depressed but never

received any rehabilitation or counseling or therapy.  They

F7g4AvaS

1   diagnosed him as a depressed individual.

2           He has never had any therapy.  He would certainly

3   welcome it if given an opportunity while incarcerated, and that

4   is what I think the president and former president were talking

5   about.  Not just throw him in, but help him when he's in, give

6   him vocational training, just don't warehouse him.

7           There's a judge -- it might have been in this court --

8   that I tried six cases in front of when the guidelines first

9   came into effect.  He said, it's a waste of time, they're going

10  to change them eventually, probably in ten years.  He was off

11  by a couple of years.  But he said, all that is going to happen

12  is people are going to be warehoused in jail and continued to

13  be warehoused in jail.  I don't think he will mind me telling

14  you, it was Judge Duffy.  I have had six trials in front of

15  him.  We know each other well.  The day that they were

16  implemented, he was against what guideline sentencing stands

17  for.  You sentence the individual, you don't sentence by the

18  number.

19          Obviously, I know the Court is not going to sentence

20  by the number, but what I'm going to ask the Court for is a

21  variance in the sentence to allow him to get below that

22  70 month threshold.  He knows he has done wrong.  But even

23  while he was doing those wrongs, he was still being the

24  caretaker to his parents that he was.  He was still

25  legitimately earning money.  He was trying to be employed.  The

F7g4AvaS

1    labor market fell apart I guess for felons and manual laborers.

2    It did for many people.  There are lawyers who still haven't

3    gotten a job who were out in the job market in 2009.

4            Obviously, what I'm saying is I think he needs a

5    break.  I know he needs a break.  The question is what should

6    it be.

7            And I know there is a need for deterrence, I know

8    there is a need for public protection and punishment, but the

9    individual is as important as the sentence itself.

10           You have read letters from loved ones.  You have read

11   his letter to your Honor.  I think he deserves one last chance

12   to live a decent life.  We're not asking to let him go home

13   tomorrow.  We understand he's going to be incarcerated for some

14   time, but what we're asking for is a prison sentence, if the

15   Court would allow, of less than 70 months.

16           At the time his mother passed away, it was in

17   December, right before Christmas, he was beside himself,

18   couldn't understand what happened.  She was, to his mind,

19   wasn't that ill, and he couldn't understand what happened while

20   he was in jail.  He wanted to visit with his mother one last

21   time.  It was right before Christmas.  And from the day he got

22   back from the prison until maybe three months later -- it is

23   hard to talk to him, he is inconsolable, but one thing he

24   brought to my attention every single time, he said, "Did you

25   talk to the marshals that brought me there, did you let them

F7g4AvaS

know how grateful I was?"  That's not a bad guy.  He still

talks about how the Marshal Service took him out, brought him

to a funeral home, maybe at night, early morning hours before

it opened, and did him that favor a day or two before

Christmas.  He learned what decency is.  He knows what decency

is.

          If the Court can find it, I would ask the Court to

impose a sentence of less than 70 months.

          Thank you very much.

          THE COURT:  Okay.  Let me hear from the government.

          MR. CAPONE:  Thank you, your Honor.

          I don't have very much to add beyond what is in USA

Masimore's submission.  This was a really serious crime.  I

don't need to spend much time on that.  The Court has had this

case for quite some time now.  The defendant was involved in

six of the burglaries.  He was an active participant in them.

He wasn't a lookout.  He was someone who went in and

burglarized pharmacies time and again in 2011, using apparently

the knowledge of welding he learned.  The PSR said he learned

welding skills, along with some of the other co-defendants in

this case, and it was a relatively sophisticated operation.

Sure, he is not a mastermind, but he is not getting mastermind

points, and he is not getting points for being a minor player.

He was a burglar for that time in 2011.

          We have just had a lengthy colloquy of his criminal

F7g4AvaS

1    history.  It is significant.  The Court has given him some

2    credit in terms of it being overstated, and I understand that.

3    But in light of that and in light of the many convictions that

4    he has had, some to jail terms that are not terribly less than

5    the guidelines range that he is now facing but that have not

6    deterred him, and when you also consider the parole violations,

7    there is a real need for deterrence here.  And so considering

8    that and the gravity of the offense and the role of the

9    defendant, I think a sentence in the guidelines range, which is

10   at the low end, just under six years, is appropriate for this

11   defendant and his role in the offense.

12            THE COURT:  Okay.  Defense counsel, I notice there are

13   some people in the audience.  Are those people here for

14   Mr. Avalo?  Can you give me a sense of who those people are?

15            MR. GREENFIELD:  Yes, your Honor.  His father,

16   brother, niece, and fiancee.

17            THE COURT:  Okay.  I have read the letters, and I have

18   read Mr. Avalo's letter, as well.  I will give Mr. Avalo a

19   chance to address me if he would like.  Before we do that, if

20   defense counsel would like, if you wish to call one of those

21   family members as a witness, I will let you do that, if you

22   want to call one of them.

23            MR. GREENFIELD:  May I have a moment, your Honor?

24            THE COURT:  Yes.

25            (Pause)

F7g4AvaS

1          MR. GREENFIELD:  Your Honor, if I might, his niece

2     wrote the Court a letter.  She just didn't anticipate anything

3     like this, nor did I.  She is not a public speaker, has never

4     been in a circumstance like this.  If we could, I would ask the

5     Court to just make any inquiry or make it as easy for her to

6     talk as possible.  I couldn't, obviously, prepare her.

7          THE COURT:  No, I don't believe it would be any sort

8     of grueling examination.  She would simply take the witness

9     stand, if she wishes.  She doesn't have to.  No one has to.  If

10     she wishes, she can take the witness stand.  She will be sworn

11     as a witness.  She can say whatever she wants to say.  If you

12     have the questions, the government has questions, if she wishes

13     to.  I don't want to make anyone uncomfortable.  I have read

14     the letter.  I have read all the letters.  If she wants to, she

15     can, but she is certainly not required to.

16          MR. GREENFIELD:  She wishes to.

17          THE COURT:  Let's have her take the witness stand and

18     have her sworn.

19      GERLYN AVALO,

20          called as a witness by the Defendant,

21          having been duly sworn, testified as follows:

22          THE DEPUTY CLERK:  Please state your first and last

23     name and spell it for the record.

24          THE WITNESS:  Gerlyn Avalo.  G-E-R-L-Y-N A-V-A-L-O.

25          MR. GREENFIELD:  With the Court's approval, can I

F7g4AvaS

1    stand here?

2          THE COURT:  That's fine.

3          Just please speak into the microphone.  Go ahead, just

4    tell me anything you would like to say.

5          THE WITNESS:  I mean, Martin is all I have known as a

6    father figure.  He is not a bad person.

7          THE COURT:  That's fine.  Just take your time.

8          THE WITNESS:  I understand, you know, we all make

9    mistakes, but like we need him home.  My grandmother died.  My

10    grandfather -- I can't do it by myself.  He was everything to

11    the family.  He was the person who cared and provided for us.

12    He was the person that, whenever we needed something, was

13    there.  He is all my grandfather really has.

14          I mean, you don't have to send him home tomorrow, but

15    I mean we don't know what can happen.  Like it is just me and

16    my grandfather.  My uncle is sick.  My dad is never around.  It

17    is just not the same.  And I'm not trying to blame him, but

18    because of the fact that he wasn't home, my grandmother went

19    through a lot of depression.  She went through a lot of pain.

20    She was very lonely.  That was her baby.  That was the son that

21    she spoke to, the son that took her to all of her appointments.

22    That was the son that helped her pay the rent.  That was the

23    son that gave her for her nails and for her hair.  I know it

24    might not be important for people, but it means something, and

25    it is important.  It is something like you want.

F7g4AvaS

1          Like, we're not perfect.  We all make mistakes.  You

2     live and learn.  And he has learned.

3          Having to see your mom in a deathbed.  You don't think

4     that is quite a punishment?  Whoever wished that on somebody?

5     Having to sleep knowing that you didn't hug your mother,

6     knowing that you're missing that, knowing that there was so

7     much you still had to accomplish as a family and you're not

8     there to be able to do that.

9          When I first went to college, I needed money, you

10    know, because financial aid wasn't helping me out.  He was the

11    only person there for me.  When I graduated high school.  When

12    I did all of my applications.  My first job.  He is all I know

13    as a father figure.  And he plays a very important role in my

14    life.  And he plays an important role in everyone's life in my

15    family.  My grandfather misses him.  I miss him.  My uncle.

16         I mean, I don't know what else to say to help people

17    understand that that is all we have.  It is not the easiest

18    thing to sit here and try to convince people, like, hey, this

19    guy's important.  Family is family.  And when somebody is there

20    for you, it is hard to live without that person.  It is not the

21    same having a collect call versus having someone home.  It is

22    not the same waking up, you know, questioning yourself, hey,

23    how are we going to pay this rent today or who is going to take

24    me to my doctor's appointment, because the person who used to

25    do that and used to help us out and was there for us is no

F7g4AvaS

1    longer there.

2         He's not a bad person.  He has one of the most amazing

3    hearts.  He is the most intelligent, loving man I know.  And to

4    me, in my eyes, he will always be a hero.  He is always going

5    to be my hero.  He is always going to be the best man I've

6    known.  No matter what happens.  No matter what the people say

7    about him.  He has impacted my life in the best way.  He can

8    impact somebody that's 22 years old.

9         That's, honestly, all I have to say.

10        THE COURT:  Okay.  Thank you.

11        Are there any questions by defense counsel?

12        MR. GREENFIELD:  No, I have no questions.

13        THE COURT:  Any questions by the government?

14        MR. CAPONE:  No, your Honor.

15        THE COURT:  I have a few questions.

16        First, I want to say I am sorry for your loss, loss of

17   your grandmother, and I know this is difficult for you, and I'm

18   certainly paying very close attention to everything you're

19   saying.

20        I am curious, how has the family been able to pay the

21   rent and pay the bills and everything?  Because I know

22   Mr. Avalo has been in custody for some time already now.  How

23   has that been going?  How are you able to do that now?

24        THE WITNESS:  Well, I work two jobs, and it is very

25   difficult for me.  Also, you know, my dad, he's not the best

F7g4AvaS

1    person to rely on, but, you know, now that my grandmother is

2    gone, you need to understand it's either we pay the rent or we

3    get it together or, you know, we're in the streets.  So I'm

4    doing the best I can, but I mean I also have schools and

5    internships.  And my dad doesn't live with us.  So majority of

6    the time I will stay with my grandfather, you know.  To me, the

7    most important thing is rent.  And then, you know, things like

8    internet or cable is just something, a privilege.  If you don't

9    have it, you don't have it.  You know what I mean?

10             THE COURT:  Have you visited Mr. Avalo while he's been

11    in custody?

12             THE WITNESS:  Yes.

13             THE COURT:  Have you talked to him about how his

14    absence has been affecting the family?

15             THE WITNESS:  Yes, he knows that.  When he calls home,

16    when I visit, you know, when I visit him.  I don't have much

17    time because I'm working, and, you know, I can't miss a day of

18    pay to see him.  It's hard.  But, I mean, this is the world we

19    live in.

20             THE COURT:  Are you able to talk to him on the phone,

21    as well?

22             THE WITNESS:  When he calls the house, but he doesn't

23    really have much time to talk.

24             THE COURT:  When you have talked to him about how his

25    absence has affected the family, how have those conversations

F7g4AvaS

1   gone?  I don't need the specific details.  How has he reacted?

2          THE WITNESS:  He understands, and he sees, you know,

3   the effect that he has caused.  And you know, I try not to make

4   him feel bad, but I mean, I also tell him, hey, maybe if your

5   actions would have been different, probably my grandmother

6   would have still been here.  You understand?  Because it is not

7   something easy when you have a mother crying every day, feeling

8   depressed, having to drink 20 pills at night, you know, sick,

9   you can't walk.  It's a lot.  And then he left us basically

10  alone.  We don't have anybody to count on.  He was all we had.

11  He was the support system.  He was the person that did

12  everything for us.

13         THE COURT:  Tell me a little bit about that, when you

14  say he did everything for you.

15         THE WITNESS:  Everything in the sense of, you know, if

16  my grandfather needed to go to an appointment, he was there.

17  If my grandmother needed her medicines, because sometimes her

18  Medicaid didn't cover for them, he was there.  When I had to

19  apply to college, when I went from a community to a four-year,

20  then I had to pay for application fees and I had to pay for

21  books.  He was there for us.  It's a lot.

22         When our cell phones -- when, you know, when I only

23  had one job and I was part-time and part-time they only give

24  you 20 hours, and I didn't have money, you know, to eat for

25  lunch, he was there.  When we needed food in the house, he had

F7g4AvaS

```
 1    it, you know.  Rent.  Light.  Everything.  Clothes.  Taxis for

 2    appointments.  He did everything.  Medicines.  Everything.  I

 3    mean, maybe it is something that people think, hey, you know,

 4    well, why don't you all work, but it is just --

 5                THE COURT:  I'm sorry, what did you say?

 6                THE WITNESS:  Sometimes people would say, well, you

 7    know, why don't you apply to a better job that pays you more or

 8    do this, but it is not as easy to sit here and say, hey, I'm

 9    just going to apply to this job or I'm just going to do this

10    when you're just adjusted to doing something and then all of a

11    sudden you have to do this 180 and change the way you're

12    living, change the time you actually spent.  You can count the

13    times and the days that I spent with my grandfather because I

14    don't have the time.  It is because I have to work so hard now

15    to help him pay bills and to help him, you know, keep the

16    apartment.  The rent went up.  The rent used to be 980.  It

17    went up to almost 1,300 bucks.  I mean, and it is just little

18    things like that.  And we need to -- if we're not there helping

19    each other out, what's going to happen to us?

20                THE COURT:  Okay.  Thank you.

21                Any other questions by the government or the defense?

22                MR. CAPONE:  No, your Honor.

23                MR. GREENFIELD:  No, your Honor.

24                THE COURT:  Okay.  Thank you very much.  You may have

25    a seat.
```

F7g4AvaS

1          (Witness excused)

2          THE COURT:  Mr. Avalo, I will give you an opportunity

3   to address me if you would like.  You can say anything that you

4   want.  You don't have to say anything.  I have read your

5   letter.  If there is anything you would like to say, now is

6   your opportunity.

7          THE DEFENDANT:  Yes, your Honor.

8          First I would like to apologize to the victims of the

9   stores that I burglarized.  I can imagine what it feels like

10  for them to come to their place of business and find it broken

11  into.

12          Now I would like to apologize to my family.  For the

13  last 15 years, I have been living in madness.  I disgraced my

14  family's last name.

15          I would like to apologize to my niece.  She's made me

16  so proud, but I haven't been there for her like I should have

17  been.  I know it must have been hard for her to lose somebody

18  she looked up to, cared for, and to not have been there for her

19  when she most needed me to be there for her, when she lost her

20  grandmother, my mother.

21          To my brothers, I'm truly sorry to you.  I wasn't

22  there for you in your darkest hours when your demons were

23  knocking on your door.  For that, I am truly sorry for you,

24  Rob.

25          To my girlfriend, she's been my angel on my shoulders.

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

F7g4AvaS

1   Comes to visit me in prison.  Been everything that I have

2   needed in a woman.  You have been the hard rock in my corner.

3   For you, I'm grateful, but I am also sorry because I pushed my

4   relationship to my back because of my imprisonments.

5        To my dad, to my father, I'm truly sorry because I

6   know you in your heart believe that you failed me, but you

7   didn't fail me.  I failed you.  I failed him.  If I would have

8   just listened to him and done things a little different and

9   took his advice, I wouldn't find myself in these circumstances

10   today that I find myself in.

11        For my mom, I have to live with the regret of knowing

12   that if I was home she probably wouldn't have died, she

13   probably wouldn't have been suffering or depressed.  If I had

14   been there to give her CPR or something, done something, but I

15   wasn't.  I got to live with that.

16        All I ask is that -- I know I made plenty of mistakes

17   in my life.  All I ask is the chance.  Words can't describe my

18   actions because actions speak louder than words.  Also, I give

19   you reasonable doubt to believe in me.  So I can show you the

20   chances, so I can show you my actions better than I can say.

21   All I can ask is to be put at the mercy of this Court, put my

22   trust in God, and ask for forgiveness.

23        Thank you.

24        THE COURT:  Okay.  Thank you.

25        Also, Mr. Avalo, on behalf of the Court, I wish to

F7g4AvaS

1    extend my condolences, as well, to you on the loss of your

2    mother, which I know has been very difficult in any event.

3    Certainly, while you've been incarcerated, I know that is very

4    difficult for you.

5              I have a couple of questions for you, Mr. Avalo.

6              I have read all of the letters.  I have listened very

7    closely to everything you have said, everything your lawyer has

8    said, everything counsel for the government has said, and

9    everything that your niece very eloquently stated here in

10   Court.

11             I truly believe that while you were out, you were in

12   fact providing great support for your family, both emotionally,

13   as well as financially.

14             One of the things that concerns me greatly is the need

15   for deterrence in this case.  This is, obviously, not the first

16   time that you've been arrested.  Your niece spoke very

17   eloquently about all of the help that you provided the family.

18   And while the emotional support, taking your family members to

19   doctors' appointments, helping people fill out applications is

20   very laudable, I am a little bit troubled by the financial

21   support.  That is certainly something that you should do, but

22   I'm worried, because according to the presentence report, you

23   really haven't been employed for a while, at least not legally.

24   I am concerned that whenever you are released, those pressures

25   to help provide support for your family and any other pressures

F7g4AvaS

you might have might lead you back down the road to selling

drugs or engaging in some other sort of illegal activity, to

not only, perhaps, feed a drug habit but also provide that kind

of financial support.

One of the things that I'm wondering about is if

you've given any thought to what it is you're going to do when

you get out.  Your lawyer spoke earlier about statements made

by various presidents, this president and a former president,

about drug rehabilitation programs, vocational training and the

like.  You've, obviously, had opportunities at drug

rehabilitation programs.  You, obviously, have a set of skills

already as a welder.

I'm just wondering if you can tell me what is your

plan for when you get out, because if it is going to be again

I'm just going to get out and get money however I can to help

support my family, you're going to be in the same situation, if

not a worse one.  I know you have had time to think since

you've been in custody, and I know it must have been difficult

because of all of the stress from the loss of your mother, but

tell me what your plan is, if there is a plan for when you get

out.

THE DEFENDANT:  My plans are simple.  My plan is to go

back to school and finish IT Tech, get back out into the

welding community, because these school systems provide you

with the necessary skills, and they put you in the work force

F7g4AvaS

environment to help you build yourself, to help you move on in
life.

I know one thing for sure.  I can't go back to what I
was doing, no matter what.  This is insanity for me to keep
seeking, keep doing the same things and expect different
results.  I have to give myself a chance.  I'm almost 40.  I
would like to some day have my own family.  I just don't want
it to be from prison.  I don't want to see myself in these
walls ever again.  I don't want to lose my dad while I'm in
prison.  I know that I have to work hard myself, and I have,
and I'm continuing to work hard.  And every day that goes by, I
keep this motto in my mind, that how would my mom look upon me.

I know I have a lot of expectancies out of family
members, but I expect more out of myself than they expect from
me, whether it be financially or emotionally or physically.

There's plenty of things that I'm good at, but I think
my craft is welding, my craft is construction.  That has always
been my craft.  I'm pretty good with my hands.  I plan to work
on that every day more and more when I'm given an opportunity.

THE COURT:  Thank you.

How long is the program that you would need to
complete at ITT Tech?

THE DEFENDANT:  It will be 18 to 24 months.  And
during all that time, you know -- I have been dealing with
addiction a lot.  How I have been dealing with it, one day at a

F7g4AvaS

1    time.  That's the motto of NA.  That's what I have been

2    attending every week.  One day at a time.  One day at a time.

3    One minute at a time.  One moment at a time.  I can't go any

4    further than that.  And I will not be dealing with addiction

5    anymore.

6          I know what I have to for myself.  I know what I have

7    to do for my family.  I'm going to do it regardless.  I'm going

8    to make it.  Because I can't fail no more.  Failure is not an

9    option for me.  If I fail, I'd just rather be dead, I'm giving

10   up on life.

11         THE COURT:  Okay.  Thank you.

12         Again, my concerns are multifold here.  There is the

13   concern, obviously, about your drug addiction, and I certainly

14   understand what you're saying in terms of taking that one day

15   at a time, but you have a criminal record.  This is another

16   conviction on your record.  Your family needs you to help

17   support them.  They're probably going to still certainly need

18   financial support from you.  And in terms of the plan, in terms

19   of your employment, that has to be more than just one day at a

20   time, because if you're just going on hope and saying I hope I

21   won't do the wrong thing, and when you get that request from

22   your family members saying that they're struggling and they

23   need help for the rent, while you're in school, I would like to

24   know if you have thought about it, and maybe we can put this

25   off and give you some more chance to think about this, but

1    there needs to be some sort of plan for either how your family

2    is going to be able to support themselves or how you're going

3    to help support them in addition to yourself while you're in

4    school, because if you're just talking about going to school

5    and not getting a salary and your family needs that financial

6    support, I'm extremely concerned as to what might happen.

7           So if you know, now tell me what is your plan for how

8    you're going to support your family and support yourself while

9    you're in school.

10          THE DEFENDANT:  Well, one of the resources I used last

11   time, how I got myself in construction work before was I worked

12   as a messenger, as a foot messenger.  The reason I did that, it

13   was a job.  It paid me.  How I did it was I did it to the best

14   of my ability.  Everywhere I went, I went into different

15   buildings, different places that a normal person can't go

16   because I was delivering packages, and I would have to use my

17   resources, I looked further on to better myself to get a better

18   job everywhere I went.  I'm willing to take the chances to go

19   back to messenger services.  I'm willing to work whatever needs

20   to be done, whether it be working at McDonald's again, which I

21   have done before, or going back to a messenger service, which I

22   know that's where I plan to go to, the messenger services

23   because they always need messengers, they always need somebody

24   to take a package here and there or bike here and there.  And I

25   know the city pretty well, and I'm willing to do whatever I

F7gWava2

1    have to do lawfully to be within the laws, be a law-abiding

2    citizen.

3                (Continued on next page)

F7gWava2

```
 1              THE COURT:  Thank you.

 2              Anything else from the defense?  Anything else from

 3   defense counsel?

 4              MR. GREENFIELD:  No, your Honor.

 5              THE COURT:  Anything else from the government?

 6              MR. CAPONE:  No, your Honor.

 7              THE COURT:  Let me ask defense counsel, and if

 8   Mr. Avala wants to answer this, that's fine as well.  Let me

 9   just address this to Mr. Avala, if you feel you can answer it.

10   Again, you've been to jail several times before.  Can you tell

11   me what is it that you feel that you've learned from each time

12   that you went to jail?  I guess, first of all, do you feel that

13   you have learned anything from the other times you went to

14   jail?  Let's start off with the time in 2001.  Do you feel that

15   you have learned anything during that period of time?  You

16   spent 54 months in jail.  And if so, what, what did you learn

17   from that?

18              THE DEFENDANT:  In 2001, what I learned was that

19   associating myself to the wrong individuals can only bring bad

20   determinations, bad decision making.  I mean, a long time ago I

21   wrote something and it went along the nature of if you roam

22   with wolves you learn how to holler, but if you associate with

23   eagles you learn to soar to great skies.  That's what I always

24   wanted, to associate myself with different individuals, to

25   become a better person.  When I was working for IBS Building
```

F7gWava2

1    Services, I was associating myself with different individuals

2    and thus staying on track.  I lost my job, I stopped working 60

3    hours a week and went back to the neighborhood to hang out in

4    front of the same places that I caught my first prior cases to,

5    just hanging around negative individuals.  That's what I

6    learned from my first bid, and it just didn't make no sense.

7            This time around, you know, it's said that a man, when

8    a man go through a harsh time in his life, when he loses

9    somebody great to him, it causes a change in him.  I lost the

10   greatest person in my life, my best friend.  I know, I know I

11   have to change.  I've been working every day implementing those

12   changes, but my changes can't really take effect between these

13   walls.  They have to be shown.  I can't tell you what my

14   changes will be, I can only show you.  And I'm just asking you

15   to give me the chance so I could show you, better than I could

16   tell you.  I've hurt my family continuously.

17           THE COURT:  Defense counsel, do you anything to add?

18           MR. GREENFIELD:  No, your Honor.

19           THE COURT:  Counsel for the government.

20           MR. CAPONE:  No, your Honor.

21           THE COURT:  I've reviewed all of the letters, and

22   again, I've listened very closely to everything Mr. Avala has

23   said.  I've listened closely to his counsel and his niece.

24   This is a very difficult decision.  What I am still very

25   concerned about, Mr. Avala, I'm not tremendously worried about

F7gWava2

1    your intentions at this time, but I am still very concerned

2    about what seems to me the lack of a fully articulated plan.

3    And what I'm really concerned about is, oftentimes, when people

4    are in prison and when people go away to prison, they get

5    forgotten, and despite the best wishes and intentions of family

6    members, life gets in the way, and if there's not a plan for

7    people to continue communicating with that family member in

8    prison, they sort of just kind of get forgotten; the phone

9    calls go from being once a week to once a month, to getting

10   shorter, and there are more and more gaps in between, and I do

11   think that the family support is critical in helping to keep

12   you motivated.

13           I'd like to maybe hear more of a plan from you and

14   perhaps your family members as to how they're going to support

15   you while you're in custody.  But more important, I'd like to

16   get a clearer sense of a fully articulated plan.  I understand

17   when you say you have to show me and can't tell me.  I

18   understand that and I agree with that.  But if you can't tell

19   me, if you haven't thought of the plan, it's kind of hard to

20   show the plan, and when life starts getting in the way, that's

21   when things fall apart.  It seems to me, from what you've said,

22   and it seems to me from the information that I have before me

23   that when things were at their best, you seemed to do OK.  When

24   you had this job and things were OK, you did all right, and

25   what you're talking about now is even things best case

F7gWava2

1    scenario.

2            What I'm concerned about is what happens if you can't

3    get a messenger job when you get out.  What is the backup plan?

4    What happens if you get a messenger job and then get fired from

5    that job?  It can't simply be there's no other plan, I'm

6    despondent now, I'm going to go back to what I did before.

7    What happens?  And again, I'm not sure how realistic it is.

8    You say you fell back into going to that old neighborhood and

9    hanging around those old places, and I understand sometimes

10   there's a tendency for people to want to believe that they can

11   simply avoid the old neighborhood.  Maybe you can, but

12   sometimes that's not really realistic because people have

13   family members and friends there, so there needs to be some

14   sort of plan as to how you can survive in that neighborhood

15   without associating with those same kind of folks and without

16   resorting to the activities you resorted to when things get

17   tough.  That's what I'm concerned about, and I'm concerned that

18   there seems to be right now a lack of that plan.

19           Here's what I propose to do, here's what I'd like to

20   do.  I'm going to continue to think about this and I think we

21   should adjourn this for some time and that will give you a

22   chance, Mr. Avala, to sit down and think about this.  The crime

23   here is serious.  I feel that it's appropriate for me to

24   sentence you to some time, but I'd like to have some sense of

25   what your plan will be while you're in prison and what your

F7gWava2

1   plan will be when you get out of prison, because I don't

2   question your intentions, and I understand what you are saying

3   and the sincerity with which you are saying these things to me.

4   And I know that you mean the things that you are saying to me,

5   and your niece certainly means the things that she's saying to

6   me.  But just honestly, you're saying these things, and again,

7   I'm not saying you don't believe them, you're saying these

8   things to me because you know that I have the power to decide

9   what your sentence is going to be.  Once I make that

10  determination, I in many ways cease to be that important in

11  your life.  But your family is going to be important in your

12  life throughout this, and I'm worried about how they're going

13  to support you, you're going to support them, and what you're

14  going to do when you get released.

15          Obviously, you're on supervised release and if you

16  violate supervised release, you could end up back before me and

17  I could sentence you to additional periods of custody.  But on

18  one hand, there are some expectations there that may not be

19  particularly relevant.  It's a pretty low threshold in terms of

20  those expectations, just hoping that you don't get arrested

21  again or don't violate the terms of supervised release, which

22  sometimes can be onerous.  But I really am concerned as to what

23  your plan is going to be and what your family's plan is going

24  to be, so I'm going to adjourn this for some time for you to

25  think about this, because I'm sure, as you indicated, back when

F7gWava2

```
 1   you did a significant amount of time in 2001 and 2002, I'm sure
 2   you thought about what you did and you had the intentions of
 3   trying to do things the right way.  But then when things go
 4   wrong in life, as they frequently do, without a backup plan,
 5   without a safety net, we tend to start resorting to those same
 6   old habits.  I'm going to give you an opportunity to think
 7   about that while I continue to think about the appropriate
 8   sentence in this case.
 9              Can we get a date, Tara, perhaps sometime in
10   September?
11              THE DEPUTY CLERK:  Friday, September is the 18th, at
12   3:30.
13              THE COURT:  Does that date and time work for everyone?
14              MR. GREENFIELD:  Yes, Judge.
15              MR. CAPONE:  Yes, your Honor.
16              THE COURT:  All right.  Again, I want to thank the
17   family members for being here today.  I want to thank you for
18   your letters.  I want to thank Mr. Avala's niece for her
19   testimony here.  I've got a lot to think about.  And,
20   Mr. Avala, you've got a lot to think about as well.  I'll see
21   you later.  Bye.
22              (Adjourned)
23
24
25
```

SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300